UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

CIVIL ACTION NO. 09-70 (WOB-JGW)

FRANCES GARDNER, ETC.                          PLAINTIFF

VS.                    MEMORANDUM OPINION AND ORDER

KENTON COUNTY, ET AL.                          DEFENDANTS


        This is an action by the administrator of the estate of a
former pretrial detainee at the Kenton County Detention Center
("KCDC") against Kenton County Fiscal Court ("Kenton County"), a
number of administrators at the jail in their official and
individual capacities, and the individual convicted of the
murder of the decedent.  Pursuant to 42 U.S.C. § 1983, Plaintiff
has alleged violations of the Eighth and Fourteenth Amendments.
Additionally, Plaintiff has brought state law claims under
theories of respondeat superior, negligent supervision, and
wrongful death.

        This matter is before the Court on the joint motion for
summary judgment of Defendants, Terry Carl, G. Scott Colvin, Kim
Roberts, and Terri Portwood ("Individual Defendants"), (Doc. 70)
and the motion for summary judgment of Defendant Kenton County
(Doc. 71).

        The Court heard oral argument on these motions on Thursday,
December 13, 2012.  Randy Byrd represented the Plaintiff; Mary
Ann Stewart represented the Individual Defendants; and

Christopher Scott Nordloh represented Kenton County.  Official
court reporter Joan Averdick recorded the proceedings.

       Having heard the parties, the Court now issues the
following Memorandum Opinion and Order.

### *Factual and Procedural History*

       On Friday, March 27, 2009, Isaac Jackson ("Jackson") was
arrested and charged with giving a police officer a false name
or address.  *See* Deposition of Lt. Hilton Humphrey, Ex. D.
The charge is a Class B Misdemeanor under Kentucky law.  Jackson
was transported to the Kenton County Detention Center ("KCDC")
at approximately 5:30 pm.  *Id.*  The following day, Staff
Sergeant Ryan Sims classified Jackson as "Restricted Custody"
and assigned him to cell 921.[1]  *Id.*  Tragically, in the early
morning of March 29, 2009, Jackson was murdered by Marion
Parker, III, one of Jackson's cellmates in cell 921.

       Inmates at the KCDC can be classified into one of five
different custody levels.  *See* Doc. 71, Ex. 10.  An inmate's
custody level is generally based on the inmate's current charge,
criminal history, and previous institutional behavior.  *Id.*
Each inmate is given a different-colored armband to signify his
custody level.  *Id.*  The level termed "Restricted Custody" is
reserved for "inmates [that] have either a history of violent

---

[1] Since Jackson was incarcerated on the weekend, Staff Sgt. Sims, the weekend
shift commander, classified Jackson instead of Lt. Hilton Humphrey, the
normal classification officer.  *See* Deposition of Ryan Sims at 13.

offenses or a violent institutional behavior."[2]  *Id*.  Kenton
County's classification system, known as JailTracker, is
designed to use objective criteria to determine the appropriate
custody level for each inmate.  *See* Deposition of Terence Carl
at 16-17.

Using the JailTracker system, deputies answer a series of
yes-or-no questions pertaining to the inmate. *See* Sims Depo. at
13-14.  One of the classification questions asks whether the
inmate has committed a violent felony within the past twenty
(20) years.  *See* Doc. 71-12.  An answer of "yes" to this
question will result in a "Restricted Custody" classification
for that inmate.  *See* Humphrey Depo. at 18-19; *see also* Doc. 71,
Ex. 12.

In this case, Sgt. Sims answered "yes" to this question
based on Jackson's 1991 conviction for aggravated robbery, and

---

[2] The remaining custody levels are defined as follows:

- Maximum Prisoner – This is the highest security risk category
  into which an inmate can be classified.  This typically includes
  capital offenses, high escape risk, or violent offenders.  A
  facility lockdown is warranted to move these inmates.
- Protective Custody – Any inmate charged with a sexually-related
  crime, inmates that need protection from others due to court
  testimonials, or gang-related needs.  A floor lockdown is
  required to move these inmates.
- Medical – These inmates have special medical needs that require
  separate housing and observation.  Medical inmates may need
  certain medical items, wheelchairs, crutches, etc.
- General Population – This is the majority of the jail's
  population.  These inmates can be used as inmate workers
  (trustees) and have no restriction on movement or activity.

*See* Doc. 71, Ex. 10.

the JailTracker software classified Jackson as "Restricted Custody." *See* Sims Depo. at 27; *see also* Doc. 71-12.

Subsequently, Jackson was placed in cell 921, with five (5) other inmates who were also classified as "Restricted Custody." *See* Humphrey Depo., Ex. D.  Three of Jackson's cellmates, Marion Parker, Brian Golsby, and Toshawn Sims, were detained on murder charges.  *Id*.

At some point in the late evening of March 28, 2009, or the early morning hours of March 29, 2009, Jackson and Parker had an altercation outside of the bathroom.  *See* Marion Parker Confession (Doc. 71-4) at p. 68-69.  Parker punched Jackson a few times, but voluntarily backed off.  *Id*.  There is nothing in the record which indicates, nor does the Plaintiff allege, that this altercation was seen by a deputy at the KCDC.

Shortly after this altercation, Jackson tapped on the cell door to get the attention of Deputy Shawn Grueser, who had only been on the job for two weeks.  *See* Deputy Shawn Grueser Deposition at 8, 17; *see also* Parker Confession at p. 81.  From inside his cell, Jackson asked Deputy Grueser if he could speak with the Staff Sergeant.[3]  Deputy Grueser testified he told Jackson he would notify his Staff Sergeant, but Jackson responded that, instead, he would write down his statement.  *See*

---

[3] The position of Staff Sergeant is also referred to in various depositions as Watch Commander (*see* Wernher Stilt Deposition at 12-13) and Shift Commander (*see* Grueser Depo. at 17).

4

Grueser Depo. at 17.   Deputy Grueser testified that he notified

his Field Training Officer, Deputy Albert Hopple, and the Staff

Sergeant on duty, Sgt. Jeremy Miller, that Jackson wanted to

speak with the Staff Sergeant. *Id.* at 20-21.

    However, Deputy Hopple and Sgt. Miller both deny that

Deputy Grueser attempted to contact them about Jackson's

request.   *See* Deposition of Deputy Albert Hopple at 21; *see also*

Deposition of Sergeant Jeremy Miller at 28.

    At approximately 4:00 a.m. and while on his rounds, Deputy

Grueser approached Jackson to see if he was finished with his

note for the Staff Sergeant. *Id.* at 21-22.   While speaking with

Jackson, Deputy Grueser heard a loud noise coming from another

cell and he went to investigate the noise.  *Id.* at 22.   At

approximately 5:15 a.m., Deputy Grueser again approached

Jackson's cell. *Id.* at 23-24.   From outside the cell, Deputy

Grueser asked Jackson if he was finished with his note, but

fellow cellmate, Toshawn Sims, responded, "No, he's fine." *Id.*

at 24, Ex. V.  Deputy Grueser testified that he did not inquire

any further since the lights were out and he "had no reason to

feel that anything had happened." *Id.*

    According to Parker, it was between 4:30 a.m. – 5:00 a.m.

that he murdered Jackson by strangulation.  *See* Parker

Confession at p. 74-75.  Parker testified that Jackson did not

scream or yell, but he hit Jackson's head against the ground

during an initial struggle. *Id*. at 76, 78. Parker stated that
this altercation lasted only about two minutes. *Id*.

After Jackson was dead, Parker cleaned up blood with the
towel, put Jackson back in his bed, and attempted to flush the
towel down the toilet. *Id*. at 77-79. Jackson's body was not
discovered until after lunch the following day, March 29, 2009,
when the toilet backed up into the cell. *See* Parker Depo. at
20-22.

In fact, deputies did a head count and served both
breakfast and lunch to the cell without discovering Jackson's
body. The KCDC officials admit that protocol was not followed
in regard to these instances. *See* Wernher Stilt Deposition at
14, 17.

Following Jackson's death, his mother, Frances Gardner, was
appointed the administrator of his estate. *See* Complaint at ¶
5. In her capacity as such, Gardner has brought suit against
Kenton County Fiscal Court and against Terence Carl, G. Scott
Colvin, Kim Roberts, and Terri Portwood,[4] seeking to hold each
liable in his or her official and individual capacities for

---

[4] Carl is the duly-elected Kenton County Jailer. Colvin is employed by Kenton
County as the Detention Center's Chief Deputy Jailer, holding the rank of
Colonel. Roberts is employed by Kenton County as the Detention Center's
Administrative Commander. Portwood is employed by Kenton County as a Booking
Supervisor in the Detention Center.

Jackson's death.[5]   Plaintiff also filed a claim against Marion

Lawson Parker, III for wrongful death.   *See* Complaint at ¶ 48.

### *Analysis*

"To successfully state a claim under 42 U.S.C. § 1983, a

plaintiff must identify a right secured by the United States

Constitution and the deprivation of that right by a person

acting under color of state law." *Russo v. City of Cincinnati*,

953 F.2d 1036, 1042 (6th Cir. 1992).   A pretrial detainee's

Fourteenth Amendment due process claim for failure to protect is

analyzed using the same standard as the Eighth Amendment.[6]   *See*

*Peart v. Seneca County*, 808 F. Supp. 2d 1028, 1031 (N.D. Ohio

2011).   The Eighth Amendment imposes a duty upon custodians of

inmates to protect them from violence at the hands of other

prisoners.   *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

---

[5] Plaintiff also has asserted claims against the "Kenton County Detention Center."   However, Defendant asserted, and Plaintiff does not dispute, that the "Kenton County Detention Center" is not a legal entity capable of being sued.   *See* Doc.71 at p. 4.   As such, Kenton County Fiscal Court is the only proper government defendant in this action.   Moreover, Plaintiff named "Unknown County Employees John and Jane Does One through Five" in her Complaint, but she has not requested to amend her Complaint to include any of the other deputies involved in this incident.   The naming of a "John Doe" does not toll the statute of limitations until such time as a real defendant may be substituted.   *See Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996).   Since this action arose in Kentucky, the applicable statute of limitations for a 42 U.S.C. § 1983 action is one year from the date the action accrues.   *See Brown v. Wigginton, Ky.*, 981 F.2d 913, 914 (6th Cir. 1992); K.R.S. § 413.140(1).   Since this claim is clearly beyond one year from the date the action accrued, any claims against the other deputies involved in this incident would be barred by the statute of limitations.

[6] Since Jackson was a pretrial detainee rather than a convicted inmate, Plaintiff cannot base a claim on a violation of Jackson's Eighth Amendment rights.   *See Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) ("The Eighth Amendment, by its terms, applies only to post-conviction inmates.") (citation omitted).

To establish liability under the Eighth Amendment for a claim based on a failure to prevent harm to a prisoner, a plaintiff must prove that the defendants acted with "deliberate indifference" to a substantial risk of serious harm. *Id*. at 834.

Defendants are liable for deliberate indifference if there was a substantial risk of serious harm to the plaintiff, defendants knew of the risk, and defendants disregarded the risk. *See Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997). Deliberate indifference is "a stringent standard of fault." *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 410 (1997). "[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond." *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir. 1997).

## 1. Constitutional Deprivation

Plaintiff asserts that Jackson's classification as "Restricted Custody" violated his rights under the Eighth and Fourteenth Amendments. *See* Doc. 80 at p. 4. Additionally, Plaintiff asserts that these same rights were violated by deliberate indifference to Jackson's safety and security on the ninth floor of the KCDC. *Id.* Since Plaintiff must assert a

constitutional deprivation to succeed on her § 1983 claims, *see*
*Russo*, 953 F.2d at 1042, this issue will be examined in regards
to all Defendants.

### A. Classification Procedure

Plaintiff asserts that the implementation and use of the
JailTracker system, which classified Jackson as "Restricted
Custody" based upon a 1991 aggravated robbery conviction, led to
Jackson's placement in a cell with Parker and, ultimately,
Jackson's death.  *See* Doc. 80 at pp. 4-6; Doc. 82 at pp. 6-7.

Plaintiff avers that use of this classification system
constituted deliberate indifference to a substantial risk that
Jackson would be murdered by Parker.  *Id*.  However, Plaintiff
has failed to establish that the classification policy subjected
Jackson to a substantial risk of serious harm or that any
Defendant knew of a substantial risk of harm associated with the
classification policy and chose to disregard it.  Therefore,
Plaintiff cannot establish a constitutional deprivation in
regards to the classification policy.

Classification at the KCDC involves the collection of
objective criteria such as an inmate's previous institutional
and criminal histories, as well as the inmate's current charge,
which is then used in conjunction with a computer program known
as JailTracker.  *See* Sims Depo. at 13-14.  Kenton County's

Jailer, Terence Carl, implemented the JailTracker software. *See* Terence Carl Deposition at 14.

In part, the JailTracker program assesses an inmate's criminal history based on whether the inmate has a violent felony conviction within the past twenty (20) years. *See* Sgt. Miller Depo. at 13. It is undisputed that Jackson was classified as "Restricted Custody" based upon a violent felony conviction from 1991. *See* Sims Depo. at 27; *see also* Doc. 71-12.

As a result of this classification, Jackson, who was incarcerated on a misdemeanor falsification charge, was placed in a cell with five other "Restricted Custody" detainees, three of which were detained on murder charges. *See* Humphrey Depo, Ex. D.

Plaintiff does not argue that Kenton County's classification procedure was unclear or that it was not followed on this particular occasion. Rather, Plaintiff asserts that the use of an objective classification system which allows for a look-back period of twenty (20) years in regard to violent felonies creates a substantial risk of serious harm to inmates. *See* Doc. 80 at p. 5.

Additionally, Plaintiff asserts that the inability of Kenton County's classification procedure to allow for deputies to use their professional judgment to override the

10

classification similarly creates a substantial risk of serious harm to inmates.  *Id*. at p. 6.

To support these contentions, Plaintiff cites to the American Correctional Association (ACA) Standards and Objective Jail Classification Systems: A Guide for Jail Administrators.[7] *See* Doc. 80 p. 5-6.  Plaintiff asserts that the ACA Standards recommend that classification systems should use either a five (5) or ten (10) year look-back period in regards to prior violent felony convictions.  *Id*.  Additionally, Plaintiff asserts that the text Objective Jail Classification Systems: A Guide for Jail Administrators recommends that a classification system should allow for jail staff to use their professional judgment to override a classification determination.  *Id*.

Although other courts have recognized that a failure to classify inmates appropriately is to disregard a substantial risk of serious harm, those instances generally involved a defendant's failure to use objective criteria to classify inmates.  *See Peart*, 808 F. Supp. 2d at 1031 (holding that the defendant's failure to use objective classification information when deciding where to house newly arrived inmates created an issue of material fact as to whether the defendants were disregarding a substantial risk of serious harm); *see also*

---

[7] Plaintiff does not provide a proper citation to either of these sources. Additionally, Plaintiff did not attach any relevant portions of these sources to her responsive memorandum.  Plaintiff's failure to properly identify these sources prevents this Court from giving these authorities any weight.

*Jensen v. Clarke*, 94 F.3d 1191 (8th Cir. 1996) (finding that defendants' use of subjective assessments rather than use of objective criteria was to disregard a substantial risk of serious harm).

In this case, the KCDC uses only objective criteria such as an inmate's previous institutional and criminal histories, as well as the inmate's current charge, to make a determination of the inmate's classification.

Essentially, Plaintiff is asserting that classifying an inmate based on a twenty-year look-back period for violent felonies creates a substantial risk of serious harm to an inmate, but a ten-year look-back period would not. Moreover, Plaintiff argues that the inability of the KCDC classification policy to allow a deputy to override the JailTracker software and reduce Jackson's classification similarly created a substantial risk of serious harm to Jackson.

In addition to the different classification standards identified by Plaintiff, she also employed the services of penologist E. Eugene Miller. *See* Doc. 71-15. Similar to the arguments proffered by Plaintiff, Mr. Miller argues that the KCDC's failure to follow the above standards resulted in Jackson's murder. *Id*. However, Mr. Miller's report fails to address how these differences created a substantial risk of serious harm to Jackson.

12

The Sixth Circuit has held that "in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues." *Doe v. Magoffin Cnty. Fiscal Court*, 174 F. App'x 962, 974 (6th Cir. 2006) (citing *Williams v. Ford Motor Co.*, 187 F.3d 533, 543 (6th Cir. 1999) (citation omitted)). "Simply having experts restate general facts and announce legal conclusions without any analysis does not create a genuine issue of material fact." *Id*.

Although Plaintiff has asserted how she believes the KCDC's classification policy to be substandard, she has failed to provide any evidence as to how these alleged shortcomings created a substantial risk of serious harm. Just because Plaintiff's proposed changes in the KCDC classification policy would have kept Jackson from encountering Parker does not necessitate a finding that a failure to implement these changes created a substantial risk of serious harm. Without other empirical evidence, Plaintiff's conclusory assertions cannot support a finding that Kenton County's current classification system creates a substantial risk of serious harm to inmates.

However, even if Plaintiff was able to show that the use of this classification system created a substantial risk of serious harm, there is no indication that Kenton County knew of any risk associated with its classification procedure or that it disregarded such risk.

Plaintiff has presented no evidence of any prior assaults or incidents which could be construed as resulting from Kenton County's classification procedure.  In fact, Plaintiff has presented no evidence from which a reasonable juror could conclude that Kenton County was on notice that its classification procedure was potentially substandard.  *See Hall v. Hawkins County, TN*, No. 2:05-CV-252, 2008 WL 474168, at *5 (E.D. Tenn. Feb. 20, 2008) (granting summary judgment in favor of the county where no evidence offered by plaintiff raised any question as to whether defendants were on notice of any prior assault resulting from the allegedly deficient classification process).

Further, it should be noted that there is nothing in the record to indicate that Jackson was exceptionally vulnerable to attacks by other inmates or that Parker had a history of institutional violence.  *See* Hopple Depo. at 14; Sgt. Miller Depo. at 35; Sims Depo. at 37; Humphrey Depo, Ex. D.  Thus, Defendants would not have been on notice that placing Jackson in a cell with Parker subjected Jackson to a substantial risk of serious harm.  *C.f. Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (finding that the plaintiff's known vulnerability made her placement with high-security inmates a substantial risk of serious harm; also finding that placing an inmate with a

known proclivity for institutional violence with other inmates created a substantial risk of serious harm).

Lastly, Plaintiff's claim fails as she has not shown a causal relationship between the classification policy and Jackson's death. *See Thompson v. Cnty. of Medina, OH*, 29 F.3d 238, 242 (6th Cir. 1994) (holding that plaintiffs could not establish a violation of their Eighth Amendment right to safety where they provided no evidence of a causal relationship between the jail's classification system and their injuries).

Although it is true that Jackson's classification resulted in his placement in a cell with Parker, Plaintiff has produced no other evidence to show that this classification actually resulted in Jackson's murder. Absent additional evidence, Plaintiff's conclusory statement that the jail classification system led to Jackson's murder is insufficient to establish a causal relationship. *See Jordan v. City of Detroit*, No. 11-CV-10153, 2012 WL 2526927 *10 (E.D. Mich. June 29, 2012), *reconsideration denied in part,* 2012 WL 3583535 (E.D. Mich. Aug. 20, 2012) (holding that summary judgment in favor of the defendant was proper because plaintiff had done no more than summarily state that his being housed in the adult population and subjected to physical violence was a result of the defendant's classification system).

15

Therefore, Plaintiff has failed to establish that the
KCDC's classification policy constituted deliberate indifference
to a substantial risk that Jackson would be murdered by Parker.
Thus, in finding no constitutional deprivation in regards to the
classification policy, Plaintiff's § 1983 claim against all
Defendants cannot be sustained on that basis.

### B. Failure to Act

Next, Plaintiff argues that Deputy Grueser's inaction after
Jackson approached him about speaking with the Staff Sergeant
constitutes deliberate indifference. *See* Doc. 80 at pp. 6-9.
Specifically, Plaintiff asserts that Deputy Grueser's failure to
remove Jackson from his cell to inquire further about Jackson's
request to speak with the Staff Sergeant and Deputy Grueser's
failure to follow up with Jackson personally about his request
later in the evening constitutes deliberate indifference. *Id*.
Moreover, Plaintiff argues that the Individual Defendants'
failure to properly supervise Deputy Grueser amounts to
deliberate indifference. *See* Doc. 82 at p. 9.  As stated
previously, a defendant acts deliberately indifferent if there
was a substantial risk of serious harm to the plaintiff, the
defendant knew of the risk, and the defendant disregarded the
risk. *See Woods*, 110 F.3d at 1222.

There is no indication in the record that Deputy Grueser,
who is not a party, was aware of any substantial risk of serious

harm to Jackson.[8]  Although Parker testified that there was a physical altercation between him and Jackson earlier in the evening (*see* Parker Confession at p. 68-69), there is no evidence, nor does Plaintiff allege, that any deputy at the KCDC was aware of this altercation.

Additionally, Parker confirmed Deputy Grueser's statement that Jackson only asked to speak with the Staff Sergeant and did not elaborate on his request. *See* Parker Depo. at 12.  When Deputy Grueser asked Jackson about why he wanted to speak with the Staff Sergeant, Jackson advised Deputy Grueser that he would write the Sergeant a note. *Id.; see also* Grueser Depo. at 20.

Construing all inferences in a light most favorable to the nonmoving party, the Court must find that Deputy Grueser failed to contact Deputy Hopple or Staff Sgt. Miller about Jackson's request. *See* Hopple Depo. at 21; *see also* Sgt. Miller Depo. at 28.  However, it is undisputed that Deputy Grueser returned to cell 921 twice to inquire if Jackson was finished writing the note. *See* Grueser Depo. at 22-25.

---

[8] Penologist E. Eugene Miller concluded that Deputy Grueser failed to appropriately respond to Jackson's safety concerns.  Doc. 71-15 p. 2. Miller's primary basis for this conclusion is an alleged, unsworn statement given by Jackson's cellmate Toshawn Sims, wherein Sims allegedly stated that Jackson originally asked Deputy Grueser to remove him from the cell because he feared for his individual well-being.  Doc. 71-15 p. 2.  Defendant Kenton County argues, and this Court agrees, that the purported statement by Toshawn Sims is hearsay, and cannot be considered by the Court.  Fed. R. Evid. 801(c).  It must also be noted that not only does Plaintiff not respond to Defendant's hearsay argument, she does not reference Toshawn Sims' alleged statement at all in either of her responsive memoranda. *See* Doc. 80, 82.

At approximately 4:00 a.m., Deputy Grueser spoke with Jackson briefly, but left when he heard loud noises from another cell. *Id*. at 22-23. At approximately 5:15 a.m., Deputy Grueser again approached cell 921 to inquire about Jackson's note, but Jackson's cellmate, Toshawn Sims, advised Deputy Grueser that Jackson no longer needed his assistance. *Id*. at 24-25. Since the lights were out and he had no suspicion of foul play, Deputy Grueser accepted Sims' statement. *Id*. at 25. According to Parker's time frame, Jackson's death had already occurred prior to Deputy Grueser's last visit to the cell. *See* Parker Confession at 74-75.

While a reasonable juror may be able to find Deputy Grueser's inactions to constitute negligence, a reasonable juror could not find these inactions to constitute deliberate indifference. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.") Although Deputy Grueser failed to report Jackson's request to his Field Training Officer or the Staff Sergeant on duty, Grueser did not completely disregard Jackson's request.

Deputy Grueser spoke with Jackson at least twice regarding his request and reported back to cell 921 about the note a third time. Again, there is no evidence during these exchanges that

18

Jackson expressed a concern for his safety.  Since there is no evidence that Deputy Grueser was subjectively aware of a substantial risk of harm to Jackson, Grueser's inactions cannot be considered deliberate indifference.

However, it is true that warnings from a prisoner himself are not required when other evidence discloses a substantial risk of serious harm.  *Woods*, 110 F.3d at 1224; *see also Farmer,* 511 U.S. at 848, ("[T]he [prisoner's] failure to give advance notice [to prison officials] is not dispositive.  Petitioner may establish respondents' awareness by reliance on any relevant evidence.").  Yet, Plaintiff has provided no other evidence beyond the interaction between Deputy Grueser and Jackson to support a finding of deliberate indifference.  As stated previously, there is nothing in the record to indicate that Jackson was exceptionally vulnerable to attacks by other inmates or that Parker had a history of institutional violence.  *See* Hopple Depo. at 14; Sgt. Miller Depo. at 35; Sims Depo. at 37; Humphrey Depo, Ex. D.  Additionally, Deputy Grueser testified that when speaking with Jackson his demeanor seemed "fine."  *See* Grueser Depo. at 18.  Plaintiff has offered no evidence to dispute this contention.  Thus, there is no other evidence in the record upon which Plaintiff could establish Deputy Grueser's knowledge of a substantial risk of serious harm.

Lastly, Plaintiff also argues that the fact that Jackson's body was not discovered until after lunch the following day should be considered as evidence of deliberate indifference towards Jackson. *See* Doc. 80 at p. 9. As stated previously, there is no doubt that the deputies who were tasked with conducting a head count on cell 921 and serving meals to this cell failed to follow proper KCDC procedure. *See* Stilt Depo. at 14, 17. However, there is also no doubt that there is no causal relationship between these deficiencies and Jackson's death. *See Farmer*, 511 U.S. at 834 (stating that for liability to attach a prison official's act or omission must result in the denial of constitutional rights) (citation omitted).

Therefore, Plaintiff has failed to establish that Deputy Grueser's actions constituted deliberate indifference to a substantial risk that Jackson would be murdered by his cellmate, Parker. Thus, in finding no constitutional deprivation in regards to Deputy Grueser's actions, Plaintiff's § 1983 claim against all Defendants cannot be sustained on that basis.

The Court notes again that Deputy Grueser was not even a party to this litigation, since he was not substituted within the limitations period, or at any other time, for one of the "John Does." *See Cox*, 75 F.3d at 240. However, the Court further notes that since Deputy Grueser was not guilty of

deliberate indifference, *a fortiori*, the supervisors who were
sued cannot be held liable.

### 2. Respondeat Superior

Liability under a § 1983 claim cannot be based on
respondeat superior. *Monell v. Dep't of Soc. Services of City
of New York,* 436 U.S. 658, 691 (1978).  Instead, to impose
supervisory liability, there must be a showing that defendants
"either encouraged the specific incident or in some other way
directly participated in it." *Bremiller v. Cleveland Psychiatric
Inst.*, 879 F. Supp. 782, 793 (N.D. Ohio 1995) (*citing Hays v.
Jefferson Cnty.,* 668 F.2d 869 (6th Cir. 1982)).  "At a minimum,
a § 1983 plaintiff must show that a supervisory official at
least implicitly authorized, approved or knowingly acquiesced in
the unconstitutional conduct of the offending subordinate."
*Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984).

Since Plaintiff cannot establish a constitutional
deprivation as required for a claim under § 1983, liability
against the Individual Defendants based upon their supervisory
status similarly cannot lie.

### 3. Plaintiff's State Law Claims

Plaintiff concedes that both Kenton County and the
Individual Defendants are immune from liability for any state
law claims under the doctrine of qualified immunity. *See* Doc.
80 at p. 11; Doc. 82 at p. 10.  Therefore, Plaintiff's state law

claims against Kenton County and the Individual Defendants for negligent supervision and wrongful death are dismissed.

### 4. Wrongful Death Claim against Marion Lawson Parker, III

Pursuant to 28 U.S.C § 1367(c)(3), the Court declines to exercise jurisdiction over Plaintiff's remaining state law claim against Marion Lawson Parker, III, and, thus, those claims will be dismissed without prejudice.

**Therefore**, having heard the parties, and the Court being sufficiently advised,

**IT IS ORDERED** that Defendants' motions for summary judgment (Docs. 70 & 71) be, and are hereby, **GRANTED**.  Counts one, two, three, four, and five as alleged against Defendants Kenton County Detention Center, Kenton County Fiscal Court, Kenton County Commissioners, Terry Carl, G. Scott Colvin, Kim Roberts, and Terri Portwood are hereby **DISMISSED WITH PREJUDICE**.  The remaining state law claim against Defendant Marion Lawson Parker, III, is hereby **DISMISSED WITHOUT PREJUDICE**.  A separate judgment shall enter concurrently herewith.

This 19th day of December, 2012.



**Signed By:**

_William O. Bertelsman_ WOB

**United States District Judge**

TIC: 11 min.